IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA, for the use of
HDR ENTERPRISES, LLC, and for the use of
STEVE ARAGON d/b/a DIVERSIFIED MASONRY CONTRACTOR;
ROCK SCAPES OF NEW MEXICO, INC.;
CHRISTOPHER HERNANDEZ; and
SHAWN SCHMIDT,

    Plaintiffs,

vs.            No. CIV 09-00437 RB/ACT

MV INDUSTRIES, INC.;
COCHITI COMMUNITY DEVELOPMENT CORPORATION;
LIBERTY MUTUAL SURETY; MICHAEL VIGIL;
GREG MASTERMAN; MICHAEL CLODFELTER;
JOHN DOES I–X; and ROE COMPANIES I–X,

    Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendants MV Industries, Inc. (MVI), Cochiti Community Development Corporation (CCDC), Michael Vigil, Greg Masterman, and Michael Clodfelter's Motion to Compel Arbitration (Doc. 22), filed August 10, 2009.

## I. PROCEDURAL BACKGROUND

Plaintiffs HDR Enterprises, L.L.C. (HDR), Diversified Masonry Contractor (DMC), Rock Scapes of New Mexico, Inc., Christopher Hernandez, and Shawn Schmidt filed this action against Defendants on May 5, 2009 alleging twenty-seven counts of wrongdoing arising out of the parties' contentious relations on two construction projects. Defendants responded, asserting twenty-seven affirmative defenses and bringing counterclaims alleging breach of contract, contracting without a

license, and malicious abuse of process. On August 10, 2009, Defendants filed a Motion to Compel

Arbitration of all disputes in this matter based on arbitration clauses within the parties' contracts.

## II.    STATEMENT OF FACTS

At the heart of this dispute are two construction projects for which MVI served as general

contractor. The first project was a federal public works project constituting a transformer

upgrade for the United States Department of Agriculture (USDA) in New Orleans, Louisiana.

Plaintiffs allege that CCDC—which they claim is an alter ego of MVI and its owner Michael

Vigil—entered into a contract with the USDA to furnish the materials and perform the labor for

this project for $163,000. HDR then signed a subcontractor agreement with MVI to complete

the transformer project for $90,000. However, HDR claims that there was an additional joint

venture agreement between the parties in which MVI agreed to contribute $37,500 towards the

materials for the USDA project, leaving MVI with a profit of $35,000 for the entire project, of

which $17,500 was to go to HDR. Thus, according to HDR, the true amount of the contract

should have been $145,000. This agreement was allegedly memorialized on the back of a file

folder and entrusted to Michael Vigil, who promised to make copies for HDR. Plaintiff HDR

claims that it would not have agreed to the contract price of $90,000 if not for MVI's

representations.

HDR completed its work on the project in a timely manner and without assistance from

MVI. The work was accepted by the USDA, and MVI paid HDR $45,000 for its work. MVI

then offered to pay an additional $24,000 owed under the contract provided HDR would first

accept a $6,000 check, cash it, and give the cash to Michael Vigil. HDR cashed the $6,000

check, gave the money to Mr. Vigil, and the $24,000 check was released to HDR. According to

Plaintiffs, however, MVI stopped payment on the check, causing it to bounce and HDR's bank

account to become overdrawn. As a result, HDR was unable to pay its suppliers for the project. Defendants, however, repudiate this version of events, claiming that they notified HDR of the stop payment. Plaintiffs also assert that Michael Vigil's father promised to perform electrical work, but failed to do so, and this resulted in HDR having to subcontract out the work at an additional expense of $6,320. HDR claims total damages of $106,320 for the USDA project.

The second project at issue in this case is the National Museum of Nuclear Science & History in New Mexico (Atomic Museum project). Plaintiffs claim $4.88 million of the funds for the museum were provided by the federal government, making it a federal public works project. While the USDA project primarily involves a dispute between HDR and MVI, all five Plaintiffs allege damages arising out of the Atomic Museum project.

According to Plaintiffs, Rock Scapes responded to a request for bids on a public works project on January 31, 2008. MVI, who was bidding on the Atomic Museum project as general contractor, was awarded the contract, which included Rock Scapes' bid for the concrete work. Plaintiffs claim that after the contract was awarded to MVI, it substituted Rock Scapes with DMC, who agreed to perform the work that Rock Scapes had bid on in the original contract. Plaintiffs argue that this substitution violated N.M.S.A. § 13-4-36 (1978), which prohibits a "contractor whose bid is accepted" from substituting a "subcontractor in place of the subcontractor listed in the original bid."

When Rock Scapes learned that MVI had been awarded the bid for the Atomic Museum project in February 2008, it contacted MVI several times during February and March to inquire about when it could expect to receive the subcontract for the project. During this same time period, however, MVI was negotiating with Steve Aragon, owner of DMC, about bidding on the project. When Rock Scapes complained about the substitution, MVI allegedly told them that the

Project Owner had beat them down on the price of the contract, and therefore, they had to find another subcontractor. MVI explained that, in the end, there was nothing they could do since they had already entered into an agreement with the other subcontractor.

Plaintiffs also assert that during the negotiations between MVI and DMC for the concrete work on the Atomic Museum project, MVI misled DMC with respect to the requirements of the project, providing DMC with estimates for the concrete work that they knew were false. MVI also allegedly pressured DMC into signing the subcontractor's agreement—telling them that if they didn't sign, they would lose the opportunity; promising to give DMC the "plaza concrete" portion of the project if it signed the agreement; and assuring them that they were still going to make a lot of money. When Michael Clodfelter (of MVI) brought the final subcontractor's agreement to DMC to sign, it was for $283,471.60, an additional $11,000 reduction from what the parties had agreed to in their negotiations. DMC claims that it only signed the contract based on Mr. Clodfelter's misrepresentations, that it lost $115,801.28 on the project, and that it never would have entered into the agreement if it had known the true facts.

Once work started on the project, DMC discovered it had to pay Davis Bacon Wages, which allegedly increased the company's labor costs by 100%. Furthermore, DMC claims that MVI informed it after work had already begun that it was obligated to perform additional work under the contract—including the construction of a ramp, loading dock, concrete stairs, retaining wall, and numerous storage rooms—and that this increased the price of the project another $100,000. Plaintiffs assert that they did not discover until after this additional work was performed that it was not included in the contract, but that if they had known, they would not have performed the work.

According to Plaintiffs, MVI also wrongfully back-charged DMC for several items that

4

were not in the contract, including $2,257.20 for anchor bolts, $316 for Remco Bolts, another $1,370.88 for anchor bolts, and $3,958.14 for damaged copper piping. Furthermore, DMC claims that MVI caused its workers to be on the site for an additional 240 hours at a cost of $9,600 and that they were not allowed to recover surplus materials from the job site. In total, DMC claims damages of $144,628.04.

DMC began work on the project in March 2008 and completed its work in October 2008. In August 2008, while DMC was performing its obligations under the contract, representatives of MVI allegedly went to DMC's office and demanded that company representatives sign a notice of termination. According to DMC, when it refused to sign, MVI removed its work crew from the job site, accusing them of stealing equipment. DMC claims that it had already completed 98% of the work on the project at that point and that MVI locked them out of the work site so that it could justify not paying them. In the end, DMC was allowed back on the job site to complete its work.

Due to the unanticipated costs of the project, DMC was unable to pay its concrete supplier, Coyote Concrete, and in October 2008, MVI prepared a promissory note representing the balance DMC owed to Coyote. MVI demanded that DMC sign the note, and according to Plaintiffs, MVI threatened to press criminal charges if DMC did not sign it. As a result of this coercion, DMC signed the note on November 6, 2008. DMC argues that this promissory note should be declared void *ab initio* because it was executed under extreme duress and false pretenses. DMC claims that Defendants' wrongful actions nearly bankrupted them, and it was unable to make even the first payment of $21,255.19 on the promissory note due January 15, 2009. When DMC failed to pay the promissory note, MVI left a voice mail for Stephanie Aragon (of DMC) on March 9, 2009 that Plaintiffs believe constitutes extortion under

5

N.M.S.A. § 30-16-9:

> Stephanie, this is Michael Vigil if you could give me a call I just talked to Marcus at Coyote. My telephone number is 872-0450 if I don't hear from you by tomorrow I guess my attorney is going to press charges against you for felony and they are going to go against your license and we are going to get a judgment against your license and we are going to get a judgement against you. I am very sorry I didn't want to have to tell you this. I didn't want to go through these steps, but you all have left us no choice. So if you could let us know what your intention is if you can take a check over to them today Monday the 9th or tomorrow the 10th I would appreciate it. If not like I said since you're the one that signed the release of claim that people have been paid and nobody was paid I think that's a felony so the cops are going to come over to your office. Anyway, I'm sorry to have to tell you this way. Goodbye.

In July 2008, while DMC was still performing under the contract, MVI also allegedly approached HDR concerning the Atomic Museum project, falsely representing that DMC was doing bad work and had been terminated, and asking HDR to submit a bid on DMC's remaining work. According to Plaintiffs, MVI also asked HDR to bid on the plaza concrete work. HDR entered a bid of $148,000 for the plaza concrete work based on its estimate of 500 yards of concrete. MVI then allegedly stated that 300 yards would be sufficient and convinced HDR to revise its bid to $121,000 under the condition that MVI would reimburse HDR for any additional concrete. HDR claims that the project ended up requiring 500 yards of concrete at an additional cost $78,427, but they were never reimbursed by MVI. HDR also claims additional losses on the plaza concrete work because it was not permitted to begin work until October 2008 and was not paid for extra work it did on the project. Michael Vigil allegedly represented to HDR that if they did extra work and helped complete the project, MVI would help out HDR with additional projects in the future. HDR further claims that it lost materials and equipment that it was not allowed to remove from the job site.

Finally, Plaintiffs claim that MVI employees made several slanderous statements about

6

HDR and its employees after it was terminated and kicked off the work site. On January 23, 2009, Micheal Vigil allegedly told Sundance Roofing that HDR was going bankrupt. On February 8, 2009, Greg Masterman allegedly called Shawn Schmidt's brother and told him that he was going to prosecute his brother for conveyance of funds. Michael Vigil also allegedly made statements accusing Defendants of being snake oil salesman, having no construction experience, embezzling money, taking drugs, and stealing equipment. Plaintiffs claim that these statements were false and made with the intent to harm Plaintiffs.

Plaintiffs assert that the conduct described above demonstrates a pattern of illegal behavior and an intent on behalf of the Defendants to defraud subcontractors out of their rightful compensation.

## III.    DISCUSSION

A motion to compel arbitration is governed by Section 4 of the Federal Arbitration Act (FAA). *Ansari v. Qwest Communications Corp.*, 414 F.3d 1214, 1218 (10th Cir. 2005). Under Section 4 of the FAA, "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. Defendants have requested such an order, asking this Court to "stay all proceedings and compel the parties to arbitrate all claims raised in Plaintiffs' Complaint pursuant to the terms of the contractual agreements cited herein." (Doc. 22, ¶ 12.)

### A.    Jurisdiction

Jurisdiction over this matter is proper pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction). Plaintiffs bring several claims under the Miller Act, 40 U.S.C. §§ 3131–3134, which grants exclusive jurisdiction to the federal

7

courts. *United States ex rel. B & D Mechanical Contractors, Inc. v. St. Paul Mercury Ins. Co.*, 70 F.3d 1115, 1118 (10th Cir. 1995).   The Act requires that "[b]efore any contract of more than $100,000 is awarded for the construction . . . of any public building or public work of the Federal Government, a [contractor] must furnish to the Government . . . [a] payment bond with a surety . . . for the protection of all persons supplying labor and material." 40 U.S.C. § 3131(b). Defendants argue that the Miller Act does not grant jurisdiction in the case at hand because MVI never furnished a bond for the projects, and the Atomic Museum project was a private project, not public.

Notwithstanding these assertions, Plaintiffs supplied labor and materials to the projects, and the Miller Act "is entitled to a liberal construction and application in order to properly effectuate the Congressional intent to protect those whose labor and materials go into public projects." *Sherman v. Carter*, 353 U.S. 210, 216 (1957); *see also United States ex rel. Noland Co., Inc.*, 316 U.S. 23, 28 (1942) (adopting definition of public works from the National Industrial Recovery Act: "any projects of the character heretofore constructed or carried on either directly by public authority or with public aid to serve the interest of the general public").

Based on Plaintiffs' factual allegations and Congress's intent that the Miller Act be liberally applied, it would appear that this Court has jurisdiction under the Act.   Furthermore, Plaintiffs alleged several counts of racketeering in violation of 18 U.S.C. §§ 1951, 1961, 1964, and others.   Thus, even if federal question jurisdiction is not proper under the Miller Act, this Court may assert subject matter jurisdiction pursuant to the Plaintiffs' racketeering claims. *But see Steel Company v. Citizens for a Better Environment*, 523 U.S. 83, 89 (1998) ("Dismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper [] when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or

otherwise completely devoid of merit as not to involve a federal controversy.'" (quoting *Oneida Indian Nation of N.Y. v. County of Oneida*, 414 U.S. 661, 666 (1974))).

Plaintiffs also bring several state-law tort, contract, and statutory claims. Although these state-law claims do not arise under federal law, they do arise out of the same case or controversy; and therefore, this Court can exert supplemental jurisdiction over the claims under 28 U.S.C. § 1367. *See Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 349 (1988) (finding that the claims must arise out of the "same nucleus of operative facts"). Essentially, Plaintiffs claim that Defendants engaged in a pattern of wrongful behavior in relation to the USDA and the National Museum of Nuclear Science & History projects designed to defraud them of their rightful compensation. Because all claims arise out of the "same nucleus of operative facts"—i.e., the construction projects—this court may exercise supplemental jurisdiction.

**B.    Venue**

The Miller Act requires that an action be brought "in the United States District Court for *any district in which the contract was to be performed and executed*." 40 U.S.C. 3133(b)(3)(B) (emphasis added). Plaintiffs brought this action in the U.S. District Court in the District of New Mexico under two separate contracts—one that was performed in Louisiana, and one that was performed in New Mexico. In their Answer, Defendants argue that this Court does not have proper jurisdiction over the USDA project because it lacks "venue jurisdiction." (Doc. 17, p. 7.) In the past, "appellate courts have not hesitated to reverse for improper venue after the merits of the case have been decided." *United States ex rel. Harvey Gulf Int'l Marine, Inc. v. Maryland Casualty Company*, 573 F.2d 245, 248 (5th Cir. 1978) (noting "unambiguous Congressional mandate that Miller Act suits be brought in the district in which the contract was to be performed 'and not elsewhere'"); *see also United States ex rel. Coffey v. William R. Austin Construction*

*Company, Inc.*, 436 F. Supp. 626, 627–28 (W.D. Okla. 1977) (transferring action *sua sponte* to another venue even though Defendants did not object to improper venue).

The 10th Circuit, however, has stated that Section 3133(b)(3)(B) of the Miller Act is a venue provision relating "to the convenience of the litigants and as such is subject to their disposition." *B & D Mechanical*, 70 F.3d at 1117–18. And several courts have found that the provision merely constitutes a waiveable venue provision incorporated into the statute for the benefit of defendants. *See F.D. Rich Co., Inc. v. United States ex rel. Industrial Lumber Company, Inc.*, 417 U.S. 116, 124–26 (1974); *B & D Mechanical*, 70 F.3d at 1117; *FGS Constructors, Inc. v. Carlow*, 64 F.3d 1230, 1232–33 (8th Cir. 1995); *Harvey Gulf Int'l Marine*, 573 F.2d at 248. Thus, "[a]lthough the language of the Miller Act . . . requiring that suits be brought in the judicial district where the contract was performed 'and not elsewhere' seems to mandate strict conformance, judicial interpretation holds otherwise." *B & D Mechanical*, 70 F.3d at 1117. At a minimum, parties can waive the venue provision of the Miller Act by contracting around it. *See id.* at 1117–18.

In the case at hand, however, there is no forum selection clause, and Defendants contested this Court's venue jurisdiction with regard to the USDA project in their Answer. Nonetheless, it appears the District of New Mexico would be overall a more convenient venue for Defendants. The two principle Defendants in this case, MVI and Michael Vigil, have their principle place of business or reside in Albuquerque. In discussing the statutory history of the Miller Act, the Fifth Circuit noted that one of the reasons behind its enactment was to avoid multiple litigation and to bring together parties from different parts of the country in one common action to promote justice and fairness. *See United States Fidelity and Guaranty Company v. Hendry Corporation*, 391 F.2d 13, 18–20 (5th Cir. 1968). Moreover, Defendants

10

could have filed a motion to sever or dismiss for lack of jurisdiction before bringing their Motion to Compel Arbitration. By bringing this Motion without first contesting jurisdiction, Defendants have waived the venue provision of the Miller Act with regard to their Motion to Compel Arbitration. *See United States ex. rel. Bryant Elec. Co. v. Aetna Casualty & Surety Co.*, 297 F.2d 665 (2d Cir. 1962) ("Objection to improper venue is only a waivable defense, lost by failure to 'interpose timely and sufficient objection.'"); *United States ex. rel. PCC Construction, Inc. v. Star Ins. Co.*, 90 F. Supp. 2d 512, 516 (D. Va. 2000) ("represents a venue provision which may be waived by parties who bring suit in an inappropriate federal forum").

### C.    Federal Arbitration Act (FAA)

For the FAA to apply to an arbitration agreement, there must be a contract "evidencing a transaction involving interstate commerce." 9 U.S.C. § 2. In *Allied-Bruce Terminix Companies v. Dobson*, the United States Supreme Court "conclude[d] that the word 'involving' is broad and is indeed the functional equivalent of 'affecting.'" 513 U.S. 265, 273–74 (1995). The FAA therefore calls for a "full exercise of constitutional power" with respect to contracts involving interstate commerce. *Id.* at 277. In this case, the arbitration agreements and contracts at issue govern two large construction projects. The USDA contract was performed in Louisiana by a New Mexico construction company. This project clearly affected interstate commerce, as there was equipment and people moving between states.

The second contract was performed in New Mexico by a New Mexico construction company. Here, there was arguably a lesser impact on interstate commerce. Some construction materials, however, must have been shipped in from out of state to complete the project; and therefore, this project also affected interstate commerce. *See id.* at 282 (finding that because materials used by the company in the performance of the contract were shipped in from outside

11

the state, the contract affected interstate commerce).

### D.    Choice of Law Provision

The arbitration agreement for the Atomic Museum project states that "judgment may be entered in accordance with the Texas Arbitration Act." (Doc. 1-3, ¶ 9.01.)  While parties may choose state law to govern their arbitration agreements, the application of state law cannot undermine the goals and policies of the FAA, and where the two conflict, the FAA must supersede state law. *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University*, 489 U.S. 468, 474–478; *Southland Corp. v. Keating*, 465 U.S. 1, 11 (1984). By enacting the FAA, Congress "withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration." *Southland*, 465 U.S. at 10.  Congress "contemplated a broad reach of the Act, unencumbered by state law constraints" and sought to combat "old common law hostility toward arbitration, and the failure of state arbitration statute to mandate enforcement of arbitration agreements." *Id.* at 13–14.  Consequently, state arbitration laws—such as the Texas Arbitration Act—can operate under the umbrella of the FAA, but state law cannot supersede federal law by reason of the Supremacy Clause. *Id.*  Thus, with regard to the Atomic Museum project, the Texas Arbitration Act would control where not superseded by the FAA.  It is important to note, however, that the choice of law provision for the Atomic Museum project does not operate as a forum selection clause.  The parties did not agree to arbitrate in Texas or agree that judgment must be entered by a Texas court; and therefore, the choice of law provision does not affect this Court's jurisdiction or its decision whether or not to compel arbitration.

### E.    Arbitration Agreement

Having determined that the Court has jurisdiction, that venue is proper, and that the FAA

applies to the agreements, we now turn to the arbitration agreements themselves to determine their validity and scope. "In adjudicating a motion to compel arbitration under the [FAA], courts generally conduct a two-step inquiry." *Webb v. Investacorp, Inc.*, 89 F.3d 252, 257–58 (5th Cir. 1996); *see also Williams v. Imhoff*, 203 F.3d 758, 764 (10th Cir. 2000). First, the Court must look to the agreement to determine whether the parties agreed to arbitrate. *Brown v. Pacific Life Ins. Co.*, 462 F.3d 384, 396 (5th Cir. 2006) (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985)). "This determination involves two considerations: (1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." *Mitsubishi Motors*, 473 U.S. at 628. Second, the Court must determine whether Congress has imposed any additional legal restraints that would foreclose arbitration of the parties' claims. *Brown*, 462 F.3d at 396 (citing *Mitsubishi Motors*, 473 U.S. at 628).

### 1.        *Validity of the Arbitration Agreement*

In the case at hand, "the question of arbitrability—whether a [contract] creates a duty for the parties to arbitrate the particular grievance—is undeniably an issue for judicial determination. Unless the parties clearly and unmistakable provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT&T Technologies v. Communications Workers*, 475 U.S. 643, 649 (1986); *see also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944–45 (1995) (finding that there is no presumption of arbitrability). Since the parties did not indicate that they wanted arbitrability decided through arbitration, this Court must make this threshold determination.

Plaintiffs assert that Defendants' motion to compel arbitration should be denied because the contract between the parties should be declared void *ab initio* due to fraud,

misrepresentation, duress, and illegality. Section 2 of the FAA provides that "an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. However, Section 4 of the FAA "does not permit the federal court to consider claims of fraud in the inducement of the contract generally." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967) (holding "that in passing upon a § 3 application for a stay while the parties arbitrate, a federal court may consider only issues relating to the making and performance of the agreement to arbitrate"). Thus, "a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator." *Buckeye Check Cashing v. Cardegna*, 546 U.S. 440, 449 (2006); *see also Brown*, 462 F.3d at 397 ("Where claims of error, fraud, or unconscionability do not specifically address the arbitration agreement itself, they are properly addressed by the arbitrator, not a federal court."); *Rojas v. TK Commc'n, Inc.*, 87 F.3d 745, 749 (5th Cir. 1996)).

In this case, the crux of the Plaintiffs' complaint is that fraud, misrepresentation, racketeering, duress, and violation of New Mexico law rendered the contract as a whole invalid, and therefore, the arbitration clause cannot be enforced because it forms part of an invalid contract that should be declared void *ab initio*. Plaintiffs, however, have made no claims of fraud or misrepresentation with regard to the arbitration clause in particular that would render it invalid, and "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." *Buckeye Check Cashing*, 546 U.S. at 445–46 (finding that an arbitration agreement is "enforceable apart from the remainder of the contract"); *see also Prima Paint*, 388 U.S. at 402–04; *Meyer v. Dans un Jardin*, 816 F.2d 533,

538 (10th Cir. 1987) ("Even a claim of fraud in the inducement of the entire contract containing an arbitration clause is to be referred to arbitration pursuant to an application under 9 U.S.C. § 3.").

In the case at hand, we are dealing with sophisticated parties that negotiated at arms length and entered into a contract containing an arbitration agreement. While there may have been some misrepresentation, fraud, duress, or illegality with respect to the contract as a whole, Plaintiffs have offered no evidence of wrongdoing by Defendants with respect to the arbitration agreement itself. This Court is limited to reviewing such claims only with regard to the arbitration agreement itself. Based on the submissions of the parties, this Court finds the arbitration agreement is valid and enforceable.

2.    *Scope of the Arbitration Agreement*

However, this does not end our analysis. We must now look at the language of the arbitration agreement to determine whether the disputes at issue in this case fall within the scope of arbitration agreement. *Cummings v. Fedex Ground Package System, Inc.*, 404 F.3d 1258, 1261 (10th Cir. 2005) (citing *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001)).

First, the Court must determine whether the arbitration clause is broad or narrow. *Id.* If the clause is narrow, then the Court must look closely at whether the dispute falls within the ambit of the clause or whether it is merely a collateral issue. *Id.* If the arbitration clause is broad, "there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it." *Id.* (quoting *Louis Dreyfus Negoce S.A.*, 252 F.3d at 224). An arbitration agreement extending to "all claims, disputes, and other matters arising out of or relating to the

15

contract or breach of the contract," or similar language, is considered broad. *See, e.g., Prima Paint*, 388 U.S. at 398 ("parties agreed to a broad arbitration clause, which read in part: 'any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration'"); *Moses H. Cone Memorial Hosp. v. Mercury Constr.*, 460 U.S. 1, 5 (1983); *P&P Industries, Inc. v. Sutter* Corp., 179 F.3d 861, 871 (10th Cir. 1999) ("such an arbitration clause, not limited to questions of contractual interpretation, is a 'broad' one"); *Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511, 1515 (10th Cir. 1995); *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995). The arbitration agreement for the Atomic Museum project requires "[a]ll claims, disputes, and other matters in question arising out of relating [sic] to this Agreement, or the breach thereof" to be submitted to arbitration. (Doc. 1-3, ¶ 9.01.) The USDA Project requires that "[i]f at any time any controversy shall arise . . . with respect to any matter or thing involved in this Agreement or breach thereof . . . said controversy shall be decided by arbitration." (Doc. 1-3, ¶ 29.) Both agreements include broad language, requiring arbitration not just for those disputes that arise out of the contract, but also any disputes relating to the contract, any matter or thing involved in the contract, or any matter relating to the breach of the contract. *See Chelsea Family Pharmacy, PLLC v. Medco Health Solutions, Inc.*, 567 F.3d 1191, 1199 (10th Cir. 2009) ("The ordinary meaning of the phrase 'relating to' is broad."). Plaintiffs' Miller Act claims and breach of contract claims clearly arise out of the contract or relate to the breach of the agreement, and therefore, they must go to arbitration.

Plaintiffs claims for slander, fraud, racketeering, conversion, intentional interference with contractual relations, and negligent and intentional misrepresentation are more difficult. On the one hand, the alleged conduct could be considered separate acts unrelated to the performance or breach of the contract. The Tenth Circuit has cautioned against extending the scope of an

arbitration clause beyond the reaches of the parties' contract, as this could produce "absurd results." *Coors Brewing Co.*, 51 F.3d at 1516. The Court posited as an example "two small business owners execut[ing] a sales contract including a general arbitration clause" who end up arbitrating a tort claim for assault under the sales contract. *Id.* Consequently, the trial court must ensure that any claims sent to arbitration are reasonably related to the parties' contract. *Id.*; *see also Long v. Silver*, 248 F.3d 309, 316–17 (4th Cir. 2001) ("governing standard for determining the arbitrability of [plaintiff's] claim is whether [] claims have a significant relationship to the . . . Agreements").

In the case at hand, it appears the majority of the alleged wrongful acts arose out of parties' contentious relations over the construction projects and their disagreements with respect to performance of those contracts. Plaintiffs' claims of slander and intentional interference with contractual relations are arguably more tangentially related to the contracts and are discussed in more detail in the following section. Most of the claims, however, comply with the Tenth Circuit's requirement that any disputes sought to be arbitrated "have a reasonable factual connection to the contract". *Coors Brewing Co.*, 51 F.3d at 1515–17. Under Count 17 (Slander), for example, Plaintiffs allege that in July 2008, Defendant Michael Vigil told HDR that MVI had terminated DMC because they "did shitty work" on the Atomic Museum project and were trying to "cheat him out of money." (Pl.'s Compl., ¶ 416.) This claim touches on Article VIII of the agreement (Termination), which provides that if the subcontractor is delayed in completing the work or fails to complete the work according to the schedule or specifications laid out in the agreement, he can be terminated. (Doc. 3, p. 20.)

The parties freely bargained for and incorporated broad arbitration clauses into their contracts; and therefore, this Court must presume that it was the parties' intent to resolve any

disputes reasonably related to the contract through arbitration. *See Cummings*, 404 F.3d at 1261 ("Where the arbitration clause is broad, there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim implicates issues of . . . the parties' rights and obligations under [the contract]."); *P&P Industries, Inc.*, 179 F.3d at 871 ("We must keep in mind that the strong presumption in favor of arbitrability applies with even greater force when such a broad arbitration clause is at issue." (internal citations and quotations omitted)).

   *3. Congressional Legal Constraints*

  If the arbitration agreement is valid and the claims fall within the scope of the agreement, then the claims generally must go to arbitration.  However, Congress may preclude parties from waiving their judicial remedies. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 29 (1991); *AT&T Techs.*, 475 U.S. at 650.  To show that Congress precluded a waiver of judicial remedies, Plaintiffs must show that Congress specifically enacted legislation prohibiting parties from waiving those remedies.  In the case at hand, Plaintiffs have shown no legal constraints imposed by Congress; and therefore, the claims may properly go to arbitration. *See Walton v. Rose Mobile Homes LLC*, 298 F.3d 470, 473 (5th Cir. 2002) (finding that the burden to show legal constraints is on party trying to avoid arbitration).

**F. Nonsignatories & Intertwined Claims**

  The majority of Plaintiffs' claims fall within the scope of the arbitration agreement and comply with the Tenth Circuit's requirement that any disputes sought to be arbitrated "have a reasonable factual connection to the contract." *Coors Brewing Co.*, 51 F.3d at 1515–16.  The Court now turns to those claims that may not have a factual connection to the contracts, and those parties that might not be contractually obligated to arbitrate their claims. *AT & T Technologies*, 475 U.S. at 649 (finding that it is the duty of the trial court, not the arbitrator, to

18

make preliminary determination whether party has a duty to arbitrate); *Oil, Chemical and Atomic Workers Int'l Union, Local 2-124 v. American Oil Co.*, 528 F.2d 252, 254 (10th Cir. 1976). Plaintiffs brought twenty-seven different counts against various Defendants.    In order to determine whether these claims are arbitrable, the trial court must evaluate the factual allegations of the complaint, applying "the language of the arbitration clause to each claim individually." *Chelsea Family Pharmacy*, 567 F.3d at 1197–98, n. 7; *see also Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 846 (2d Cir. 1987) ("in determining whether a particular claim falls within the scope of the parties' arbitration agreement, we focus on the factual allegations in the complaint rather than the legal causes of action asserted").    Arbitration may be ordered for some of these claims, but not for others. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217–18 (1985).    Plaintiffs, however, as the party opposing arbitration have the burden of rebutting the presumption of arbitrability. *See Mitsubishi Motors*, 473 U.S. at 626.

This case also presents the added complication that several of the Defendants and two of the Plaintiffs were not signatories to the USDA or Atomic Museum project contracts.    Plaintiffs argue that the Court cannot compel non-signatories to arbitrate. *See American Oil Co.*, 528 F.2d at 254 ("The issue of arbitrability is for judicial determination because no party has to arbitrate a dispute unless it has consented thereto.").    Over the years, however, many circuits, and more recently the U.S. Supreme Court, have recognized several circumstances under which traditional principles of contract law may be employed to allow an arbitration agreement to be enforced by or against a non-signatory. *Arthur Anderson LLP v. Carlisle*, 129 S. Ct. 1896, 1902 (2009) ("'traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver, and estoppel'"); *Bridas A.A.P.I.C. v. Gov't of*

19

*Turkmenistan*, 345 F.3d 347, 356 (5th Cir. 2003) ("Six theories for binding a nonsignatory to an arbitration agreement have been recognized: (a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing/alter ego; (e) estoppel; and (f) third-party beneficiary."). The Court must determine whether these contract theories can be applied in this case to compel non-signatories to arbitrate.

### 1. Count 4: Violation of N.M.S.A. 13-4-36

In Count 4, Rock Scapes brings an action against MVI for violation of N.M.S.A. § 13-4-36 (1978), which states that "[n]o contractor whose bid is accepted shall substitute any person as subcontractor in place of the subcontractor listed in the original bid." At no time did Rock Scapes contractually agree to arbitrate its claims with Defendants, and because arbitration is a matter of contract, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960). Furthermore, Rock Scapes is not bound by estoppel or other contract principles to arbitrate its claims—it is not an agent or third-party beneficiary, it did not assume any responsibilities under the contracts, and it is not relying on the contracts to bring its claim against MVI. Therefore, this Court cannot grant Defendants' Motion to Compel Arbitration with regard to Count 4.

### 2. Counts 15 & 16: Negligent & Intentional Misrepresentation

In Counts 15 and 16, Plaintiff DMC claims intentional misrepresentation (fraud) by Defendants Clodfelter, Vigil, and MVI in relation to the Atomic Museum project contract. DMC argues that the Court cannot compel arbitration of these claims because (a) Counts 15 and 16 sound in tort and do not rely on the parties' contract, and (b) a non-signatory (Clodfelter) cannot compel a signatory to arbitrate.

20

Under Counts 15 & 16, Plaintiff DMC alleges that Defendant Clodfelter, an employee of MVI, contacted Steve Aragon, owner of DMC, about bidding on the concrete work for the Atomic Museum project in February 2008.  Clodfelter and Aragon had been friends for several years, and DMC alleges that Clodfelter pressured Aragon into accepting the project, claiming that it was a great opportunity and that DMC could make a lot of money on the project.  Plaintiff further alleges that Clodfelter made several intentional misrepresentations about the project during the negotiations, in the contract, and during performance of the contract.  Plaintiff DMC's primary allegation is that Clodfelter represented that the numbers for the project were good and that Aragon would not have to do any estimating for the project, insisting that time was of the essence and that DMC should sign the agreement.  Additionally, DMC claims that during the course of performance of the contract, Clodfelter informed DMC that it was obligated under the contract to build a ramp, loading dock, concrete stairs, retaining wall, and numerous storage rooms, but in actuality, these items were not included in the contract.  As a result of these misrepresentations by Defendants, DMC claims losses of $144,628.04 on the project.

As to DMC's first argument that the Court cannot compel arbitration because its claims are based in tort and do not rely on the parties' contract, it is well-established that a party cannot avoid arbitration by simply casting its complaint in tort instead of contract. *See Chelsea Family Pharmacy*, 567 F.3d 1191 ("Focusing on the facts rather than on a choice of legal labels prevents a creative and artful pleader from drafting around an otherwise-applicable arbitration clause."); *Grigson v. Creative Artists Agency, LLC*, 210 F.3d 524, 527 (5th Cir. 2000); *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757–58 (11th Cir. 1993); *Hughes Masonry Co., Inc. v. Greater Clark County School Building* Corp., 659 F.2d 836, 838 (7th Cir. 1981); *Acevedo Maldonado v. PPG Indus., Inc.*, 514 F.2d 614, 616 (1st Cir. 1975).  Provided the claims have a

21

"reasonable factual connection to the contract" the trial court may compel arbitration. *Coors Brewing Co.*, 51 F.3d at 1516; *see also United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, No. 95-1184, 1996 WL 55657 (10th Cir. Feb. 9, 1996); *Genesco*, 179 F.3d at 856 ("If the allegations underlying the claims 'touch matters' covered by the parties' [contract], then those claims must be arbitrated, whatever the legal labels attached to them.").

In its complaint, DMC alleges that the amount of material specified in the contract was false, that Clodfelter and MVI knew the numbers were false, and that they didn't disclose this information to DMC. If these allegations are true, then DMC has successfully stated a claim for fraudulent misrepresentation as to a material term of the contract and can claim damages under both tort and contract. However, DMC's allegations directly relate to the parties' contract and its primary claim that it was fraudulently induced by Plaintiffs to enter into the contract and that it unjustly enriched Defendants by performing more work than was required under the contract. Consequently, even though Plaintiff's claim is cast in tort, it clearly has a factual basis in the parties' contract and is arbitrable.

Turning to Plaintiff's second argument, that a non-signatory cannot compel a signatory to arbitrate, there is significant case law supporting the notion that a non-signatory can enforce an arbitration agreement against a signatory under a theory of agency or equitable estoppel.[1]

---

[1] In an arbitration case, the U.S. Supreme Court recently recognized that "'traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver, and estoppel.'" *Arthur Anderson*, 129 S. Ct. at 1902. While the Tenth Circuit has not explicitly recognized agency or equitable estoppel theories to permit a non-signatory to compel a signatory to arbitrate, in a footnote it did cite to the Sixth Circuit case *Arnold v. Arnold Corp.*, 920 F.2d 1269, 1281 (6th Cir. 1999), for the proposition that "nonsignatories of arbitration agreements may be bound by such agreements under ordinary contract and agency principles." *Gibson v. Wal-mart Stores, Inc.*, 181 F.3d 1163, 1170, n. 3 (10th Cir. 1999). Furthermore, the Tenth Circuit has found that a non-signatory may enforce an arbitration agreement if he is a third party beneficiary, *O'Connor v. R.F. Lafferty & Co.*, 965 F.2d 893, 901 (10th Cir. 1992), or the alter-ego of a signatory, *Altresco Philippines, Inc. v. CMS Generation Co.*, No. 96-1080, 1997 WL 186527, at *5 (10th Cir. Apr. 17, 1997). Equitable estoppel theories have been explicitly recognized by the Second, Fifth, Eighth, and Eleventh Circuits. *See, e.g., Grigson*, 210 F.3d at 527

Furthermore, carrying Plaintiff's argument to its logical conclusion would create the unjust situation in which any party could avoid an arbitration agreement by merely suing an employee or agent of the principal. *See Gibson*, 181 F.3d at 1170, n. 3.

"[A]pplication of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." *Grigson*, 210 F.3d at 527. Plaintiff DMC cannot in one breath argue that Clodfelter was acting in conjunction with and on behalf of HDR, a signatory to the agreement, and in the next argue that Defendant cannot compel arbitration under the agreement because he is a non-signatory—"to allow such inconsistent positions would be inequitable, to say the least." *Id.* at 528. "In short, although arbitration is a matter of contract and cannot, in general, be required for a matter involving an arbitration agreement non-signatory, a signatory to that agreement *cannot* . . . 'have it both ways': it cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the

---

(applying "intertwined claims" theory of equitable estoppel); *CD Partners, LLC v. Grizzle*, 424 F.3d 795, 798 (8th Cir. 2005) ("When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate" (quoting *Sunkist*, 10 F.3d at 757); *MS Dealers Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999) ("application of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract"); *Sunkist*, 10 F.3d at 757 (finding that signatory was bound to arbitrate with non-signatory due to "the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract"); *Thomson-CSF, S.A. v. American Arbitration Assoc.*, 64 F.3d 773, 779 (2d Cir. 1995) ("circuits have been willing to estop a signatory from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed"); *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 131 (2d Cir. 2003) ("'alternative estoppel theory' which takes into consideration the relationships of persons, wrongs, and issues"); *Astra Oil Co, Inc. v. Rover Navigation, Ltd.*, 344 F.3d 276, 279 (2d Cir. 2003) ("we held that the signatory was estopped from avoiding arbitration because 'the issues the nonsignatory [was] seeking to resolve in arbitration [were] intertwined with the agreement that the estopped party [had] signed'" (quoting *Smith/Enron Cogeneration, Ltd. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 98 (2d Cir. 1999))). Notably, a search of Tenth Circuit case law did not find any cases explicitly rejecting the agency or estoppel theories.

other hand, deny arbitration's applicability because the defendant is a non-signatory." *Id.* (citing *MS Dealers*, 177 F.3d at 947); *see also Hughes Masonry*, 659 F.2d at 838–39.

In Counts 15 & 16, DMC also alleges that "at all times" Clodfelter was "working under the direction of [Michael] Vigil who knew or should have known that DMC was being fraudulently induced to enter into a subcontract to perform work and to provide additional labor and materials under false pretenses." (Pl.'s Compl., ¶ 405.) Indeed, throughout their complaint, Plaintiffs maintain that Clodfelter was an employee of MVI, that he was acting "in accordance with the directions and at the behest of Michael Vigil," president and owner of MVI, and that "at all times" he was "acting in the course and scope of his agency and employment." (Pl.'s Compl., Doc. 3, ¶¶ 9–10, 35, 450.) Generally, "[a] corporation can act only through its officers and employees," and therefore, "[any] act or omission of an officer or an employee of a corporation, within the scope of course of his employment, is the act or omission of the corporation." Civ. U.J.I. 13-409 N.M.R.A. (2009). If Defendant Clodfelter was acting in the name of the company, then he should also be protected by the company's arbitration clause, and Plaintiff DMC should be compelled to arbitrate with Clodfelter as an agent of the company, which is the primary target of Plaintiff's suit.

Even though Plaintiff's claims sound in tort and Clodfelter is a non-signatory to the arbitration agreement, the claims have a significant connection to the signatory Defendants and a factual basis in the contract, and as a result, the arbitration agreement must be enforced. Plaintiff's claims under Counts 15 and 16 rely on the terms and conditions of the contract for their resolution, and therefore, they have a reasonable factual relation to the contract. Defendant Clodfelter can compel Plaintiffs to arbitrate under an agency or estoppel theory. Clodfelter was clearly acting in the name of MVI, Plaintiffs knew they were dealing with an agent of MVI, and

Plaintiffs have not alleged that Clodfelter was acting outside the scope of his agency. Thus, "Plaintiffs have failed to rebut the presumption of arbitrability." *Armijo v. Prudential Ins. Co. of America*, 72 F.3d 793, 798 (10th Cir. 1995) (citing *Mitsubishi Motors*, 473 U.S. at 626).

> 3.    *Count 17: Slander*

Under Count 17, Plaintiff DMC brings a slander claim against Defendants MVI, Vigil, and Clodfelter based on the following factual allegations: (1) On August 9, 2008, Defendant Clodfelter accused DMC's work crew at the Atomic Museum project of stealing equipment from the work site; (2) in July 2008, Defendant Michael Vigil told HDR that he had terminated DMC because they "did shitty work" and were trying to "cheat him out of money;" and (3) on several occasions, Michael Vigil accused DMC employees of committing felonies. (Pl.'s Compl., ¶¶ 412, 416 and 420 & Counts 14–16.) Plaintiff argues that the Court should refuse to compel arbitration of these claims because a non-signatory cannot compel a signatory to arbitrate and because Count 17 sounds in tort, and DMC does not rely on the parties' contract to bring the claim.

Again, DMC's claims "have a reasonable factual connection to the contract," *Coors Brewing Co.*, 51 F.3d at 1515–16, and as they clearly arise out of and relate back to the parties' contractual agreement, Plaintiff cannot avoid arbitration by framing its complaint in tort. *P&P Industries, Inc.*, 179 F.3d at 871–72. MVI allegedly committed slander by stating to various people that DMC had been terminated from the project because they were doing "shitty work," stealing equipment, and committing felonies by not paying their subcontractors. Substandard or defective work and stealing equipment could be grounds for termination under Article VIII (Termination) of the contract. Furthermore, Article IV (Price and Payments) and Article VIII (Bonds and Warranties) require the subcontractor to make its payments for material, equipment,

and labor.

The broad arbitration agreement between DMC and MVI encompasses "[a]ll claims, disputes, and other matters in question arising out of relating [sic] to this Agreement, or the breech thereof." (Pls.' Compl. Ex. 4.)  At its heart, this litigation is primarily a contractual dispute with Plaintiff claiming that it was fraudulently induced to enter into the agreement and then wrongfully terminated before it had a chance to complete performance, and Defendants claiming that Plaintiff was terminated because it breached its contract by not paying all of its suppliers, did not complete its work, and the work that was done was substandard and had to be replaced or repaired.  Thus, Count 17 has a significant connection to the contract's terms and conditions and falls within the scope of the arbitration agreement.

As discussed in the preceding sub-section (*Counts 15 & 16: Negligent & Intentional Misrepresentation*), the signatory Plaintiffs should be estopped from refusing to arbitrate with a non-signatory Defendant.  Plaintiff's claims under Count 17 relate directly to the contract and to MVI and Michael Vigil, both signatories of the agreement.  Plaintiff's only direct claim against Clodfelter is that he falsely accused DMC's work crew of stealing equipment and stated he was going to station an armed guard at the site.  However, according to the parties' pleadings, at the time Clodfelter made this statement, he was acting in his capacity as an employee of Vigil and MVI, and not in his personal capacity.  When there are allegations of such "substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract," equitable estoppel is clearly warranted. *Grigson*, 210 F.3d at 527.  If DMC is seeking to hold signatories Vigil and MVI liable for the acts of their agent, Clodfelter, then the non-signatory agent should be able to invoke his employer's arbitration clause. *Roby v. Corporation of Lloyd's*, 996 F.2d 1353, 1360 (2d Cir 1993); *Arnold*, 920 F.2d at 1281–82

26

(finding non-signatory defendants entitled to arbitration as agents of the signatory defendant and following "the well-settled principle affording agents the benefits of arbitration agreements made by their principal"); *CD Partners*, 424 F.3d at 800 (finding that non-signatory employees could enforce arbitration agreement against signatory); *Letizia v. Prudential Bache Securities, Inc.*, 802 F.2d 1185, 1188 (9th Cir. 1986) (finding arbitration agreement applied to non-signatory employees of principal); *Creative Telecomms., Inc. v. Breeden*, 120 F. Supp. 2d 1225, 1240 (D. Haw. 1999) (citing numerous cases from various Circuits) ("Federal courts have consistently afforded agents, employees, and representatives the benefit of arbitration agreements entered into by their principals").

### 4.    Counts 19 & 20: Slander

In Counts 19 and 20, non-signatory Plaintiffs Hernandez and Schmidt allege several instances of slander by signatory and non-signatory Defendants.  In Count 19, Michael Hernandez of HDR brings a claim for slander against MVI and Michael Vigil.  In support of his claim, Hernandez makes the following factual allegations:  (1) Shawn Schmidt, also from HDR, met with Michael Vigil at MVI's office in January or February 2009 at the request of Michael Vigil, and at this meeting, Vigil told Schmidt that "Hernandez was a snake oil salesman, that Hernandez had no construction experience, and that Hernandez had embezzled money from HDR;" (2) Around the same time, Schmidt's ex-wife had lunch with Michael Vigil, who told her that Hernandez had embezzled money from HDR, and that both Schmidt and Hernandez were "doing drugs" and were "drug dealers;" and (3) Vigil made these statements to harm Hernandez' reputation and interfere with Schmidt's and Hernandez' business relationship at HDR. (Pl.'s Compl., ¶¶ 435, 439–40.)

In Count 20, Schmidt alleges several instances of slander by MVI, Vigil, and non-

signatory Defendant Masterman.   On February 8, 2009, Masterman allegedly called Shawn

Schmidt's brother, Jeremy Schmidt, and "told him that his brother Shawn was in big trouble and

that he was under federal indictment because Vigil was going to prosecute him for conveyance

of funds." (Pl.'s Compl., ¶ 447.)   Schmidt alleges that similar conversations between his brother

Jeremy and Defendant Masterman took place after February, and that Masterman made these

statements to injure Schmidt's reputation and to interfere with his business relationship with

Hernandez. (Pl.'s Compl., ¶ 449.)

Arbitration agreements are much more rarely enforced by a signatory against a non-

signatory than by a non-signatory against a signatory. *Bridas*, 345 F.3d at 358.   "It is more

foreseeable, and thus more reasonable, that a party who has actually agreed in writing to arbitrate

claims with someone might be compelled to broaden the scope of his agreement to include

others." *Id.* at 361.   However, where the party seeking to avoid arbitration is a non-signatory, a

trial court should be wary of imposing a duty to arbitrate. *Smith/Enron Cogeneration*, 198 F.3d

at 97.   Arbitration is clearly a contractual matter, and "a party cannot be required to submit to

arbitration any dispute which he has not agreed so to submit." *United Steelworkers*, 363 U.S. at

582.

As previously discussed, however, several courts have concluded that "a nonsignatory

party may be bound to an arbitration agreement if so dictated by the 'ordinary principles of

contract and agency.'" *Thomson-CSF, S.A.*, 64 F.3d at 776; *see also Bridas*, 345 F.3d at 356.

Nonetheless, under Counts 19 and 20, there are several reasons why it is more difficult to

compel arbitration through an estoppel or agency theory, and why it is reasonable to expect a

different outcome for these particular claims.   First, Hernandez and Schmidt bring this claim in

their personal capacities, and not in conjunction with their employer.   Second, while the claims

arose out of the parties' business relations, they are also more tangentially related to the contract. Vigil and Masterman allegedly made these statements to harm Hernandez' and Schmidt's reputations and interfere with their business relationship, but unlike other alleged statements by Michael Vigil, these statements appear to be a direct personal attack on Hernandez and Schmidt, rather than an allegation of nonperformance or breach of contract by the agents' employer. Accusing Hernandez and Schmidt of being drug dealers or embezzling money has little to do with the performance or nonperformance of their duties under the Atomic Museum contract.

Count 20 is particularly troubling for another reason. Plaintiff Schmidt brings this action not only against signatory Defendants MVI and Vigil, but also non-signatory Defendant Masterman. This raises the question of whether it is ever possible for a non-signatory to compel another non-signatory to arbitrate. While Masterman was allegedly operating as an agent/employee of MVI when he made these statements, and arguably should be protected by the arbitration agreement, it is a stretch to say that he should be able to invoke the arbitration agreement against non-signatory Schmidt, especially where the claim is so far removed from the contract. If Schmidt were attempting to bring a claim arising out of the contract between HDR and MVI against Masterman, then Masterman could potentially invoke the arbitration agreement against Schmidt under a theory of equitable estoppel and as an agent and employee of MVI. However, based on the facts alleged in the parties' pleadings, an agency or estoppel theory is not appropriate for this claim. Therefore, the Court should not compel arbitration for Counts 19 and 20.

### 5.    *Count 21: Intentional Interference with Contractual Relations*

Under Count 21, signatory Plaintiff HDR claims intentional interference by signatories MVI and Michael Vigil with contractual relations between HDR and Viscom in a third and

29

separate construction project. HDR alleges that it contracted with Viscom to supply labor and materials for Phase 1 of the Cochiti Campground construction project. However, Michael Vigil and MVI allegedly "told Viscom that HDR [was] going bankrupt and otherwise, besmirched HDR's reputation with Viscom such that they terminated HDR from the project without cause and have refused to do any further business with HDR." (Pls.' Compl. ¶ 461.) HDR claims that due to Defendants' illegal and fraudulent acts, Viscom refused to pay HDR the $36,000 that was due on the project, and as a result, HDR is currently unable to pay its suppliers.

The parties' arbitration agreement cannot be stretched to cover Count 21. The claim is simply too far removed from any of the parties' duties or rights under the contract. The factual allegations set forth in Count 21 involve a separate construction project and new parties not involved in the Atomic Museum project. The Tenth Circuit has clearly stated that "only claims having 'a reasonable factual connection to the contract' are arbitrable." *United Int'l Holdings*, 1996 WL 55657, at *3 (quoting *Coors Brewing Co.*, 51 F.3d at 1516). "[MVI's] duty, if any, not to interfere with a contract between [HDR and Viscom] is unrelated to any obligation imposed by the" contract between HDR and MVI. *Altresco Philipines*, 1997 WL 186257, at *4. Consequently, the Court should not compel arbitration of Count 21.

### 6.    Count 24: Racketeering in Violation of N.M.S.A. § 30-42-6(A)

In Count 24, all Plaintiffs (HDR, DMC, Rockscapes, Hernandez, and Schmidt) bring claims against Defendants MVI, Michael Vigil, Masterman, and Clodfelter alleging racketeering in violation of N.M.S.A. § 30-42-6(A) 1978. In addition to the factual allegations already discussed, Plaintiffs also allege the following facts in support of their claim. In October 2008, Michael Vigil allegedly prepared a promissory note in the amount of $85,020.76, representing the balance DMC owed Coyote Concrete for services and materials rendered in relation to the

Atomic Museum project, and demanded that Steve Aragon of DMC sign the note. Plaintiffs claim the note was signed "under extreme duress and false pretenses based upon extortion" (Pls.' Compl. ¶ 492), with Michael Vigil telling Steve Aragon that he and his daughter had committed felonies, that they would go to jail, that Aragon would lose his license, and that Vigil's attorney would press criminal charges if he didn't sign the note. According to Plaintiffs, because Defendants' actions had placed them so near bankruptcy, they were unable to make even the first payment on the promissory note, and as a result, Michael Vigil left the threatening voice mail for Stephanie Aragon, discussed above in the Statement of Facts, where he threatens to press charges against DMC if they don't make a payment to Coyote Concrete. (Pls.' Compl. ¶ 494.)

Additionally, Plaintiffs allege that on or about January 15, 2009, Michael Vigil told Shawn Schmidt of HDR that he and Angelica Romero, HDR's President, were committing criminal offenses that would subject them to fines and jail time, advising Schmidt that he should leave HDR and go work for MVI, and implying that by doing so he could avoid prosecution. Plaintiffs also allege that on February 8, 2009, Greg Masterman of MVI called Jeremy Schmidt, Shawn Schmidt's brother, and told him that Shawn was under federal indictment for conveyance of funds and that "he should get away from Chris Hernandez because bad things were going to happen." (Pls.' Compl. ¶ 497.) Plaintiffs claim that taken together these acts constitute racketeering, fraud, and extortion.

Plaintiffs argue that these claims cannot be arbitrated because they do not arise out of the parties' contractual obligations, but rather Defendants' criminal wrongdoing. Furthermore, since Count 24 alleges wrongful acts by non-signatory Defendants Masterman and Clodfelter, Defendants argue that the non-signatories cannot compel arbitration because "the Plaintiffs' claims as against the non-signatories are not intertwined with the underlying contract

31

obligations." (Doc. 24, p. 18.)

Based on Plaintiffs' factual allegations, this claim is arbitrable, as all of the claims have "a reasonable factual connection to the contract." *Coors Brewing Co.*, 51 F.3d at 1516. Plaintiffs allege that Defendants' actions constituted fraud and extortion, and taken together evidence a pattern of criminal activity constituting racketeering; however, this does not mean that the claims are not arbitrable. *See Shearson/American Exp., Inc. v. McMahon*, 482 U.S. 220 (1987) (finding racketeering claims are arbitrable and no specific Congressional intent to preclude arbitration). If the claims relate to the contract and fall within the scope of the arbitration agreement, then they are arbitrable. Plaintiffs are claiming that they were fraudulently induced into signing these contracts, that the contracts were not nearly as profitable as promised, and that when Plaintiffs couldn't pay their subcontractors, Defendants threatened to accuse them of crimes if they did not sign a promissory note and make payments on the promissory note. Therefore, the claims at issue clearly arise out of the parties' disputes relating to the contract.

Plaintiffs also argue that Count 24 is not arbitrable because non-signatory Plaintiffs Hernandez and Schmidt cannot be compelled to arbitrate. Plaintiffs rely on Defendants' alleged crimes of fraud and extortion as the basis for their racketeering claim. Plaintiffs' fraud claims were already discussed in Subsection 1 (*Negligent & Intentional Misrepresentation*) with regard to Counts 15 & 16 and found to be arbitrable. These alleged acts would have had little or no impact on Plaintiffs Hernandez and Schmidt in their personal capacities, affecting them only insomuch as they were employees of DMC. Therefore, the fact that non-signatories Hernandez and Schmidt were named as Plaintiffs should not preclude arbitration.

The same holds true for Plaintiffs' extortion claims. Extortion requires that one seek to obtain something of value or compel a person to do something against his will through the use of

threat. Defendants allegedly sought to influence Steve Aragon to sign and make payments on a promissory note by threatening to accuse him of a crime. However, Defendants were not seeking to obtain anything from Steve Aragon or Plaintiffs Hernandez and Schmidt personally, but rather from their company, DMC. Again, it would be unjust for a party to avoid arbitration by merely naming an employee or agent as a party to the litigation. *See Gibson*, 181 F.3d at 1170, n. 3. The real targets of Defendants alleged wrongful acts are HDR and DMC, not their employees, and if Hernandez and Schmidt wish to bring an action against Defendants for racketeering based on the facts in this case, they must do so through their employer, who is contractually bound to the arbitration agreement.

Next, we turn to Plaintiff Rock Scapes who is neither an employee, member, or agent of any of the signatory companies. Rock Scapes' claims have little or no relation to the contracts at issue in this case or to the claims brought under Count 24. Rock Scapes is not a third-party beneficiary of the contract, it is not an alter-ego of the Plaintiffs, and it was not delegated and did not assume any duties under the contract. Rock Scapes' only link to this Count and to Plaintiffs litigation is that it is claiming Defendants violated New Mexico law when they substituted Rock Scapes for HDR after its bid for the Atomic Museum project was accepted. Plaintiffs claim that this was part of a larger pattern of criminal behavior constituting racketeering, but this is not one of the cited offenses under the New Mexico statute for racketeering. N.M.S.A. § 30-42-3(A) (1978). Nonetheless, Plaintiffs claim that the alleged violation of New Mexico law also constituted an act of fraud, which includes "the intentional misappropriation or taking of anything of value that belongs to another by means of fraudulent conduct, practices or representations." N.M.S.A. § 30-16-6(A) (1978).

Defendants also argue that Rock Scapes should be compelled to arbitrate because its

dispute is closely linked to that of the other Plaintiffs. To support this proposition, Defendants cite several cases where a parent company or its subsidiary was compelled to arbitrate due to their corporate relationship. However, unlike the case at hand, these relationships were contractual, and businesses that enter into partnerships or parent-subsidiary relations generally do so through a partnership or merger agreement. In the case at hand, no such contractual relationship exists between Plaintiffs and Rock Scapes.

Rock Scapes' involvement in this case is unrelated to the parties' contractual rights, duties, and obligations under the USDA and Atomic Museum project; and therefore, contract principles cannot be applied to compel Rock Scapes to arbitrate as a non-signatory. *See United Steelworkers*, 363 U.S. at 582 ("arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit"); *Zimmerman v. Int'l Companies & Consulting, Inc.*, 107 F.3d 344, 346 (5th Cir. 1997) (finding that the FAA does not compel arbitration "for parties who have not contractually bound themselves to arbitrate their disputes"). Consequently, this Court will not compel Plaintiff Rock Scapes to arbitrate this dispute with Defendants.

Finally, we address the non-signatory Defendants. Throughout their complaint, Plaintiffs allege that non-signatory Defendants Masterman and Clodfelter were employees of signatory Defendants MVI and Michael Vigil, that they were acting "in accordance with the directions and at the behest of Michael Vigil," president and owner of MVI, and that "at all times" they were "acting in the course and scope of his agency and employment." (Pl.'s Compl., Doc. 3, ¶¶ 9–10, 35, 450.) Having so vigorously insisted that the actions of Masterman and Clodfelter were equivalent to those of MVI, Plaintiffs should not now be able to deny the applicability of the arbitration agreement simply because two of the Defendants are non-signatories. *Grigson*, 210

F.3d at 528 (citing *MS Dealers*, 177 F.3d at 947); *see also Hughes Masonry*, 659 F.2d at 838–39. And if Plaintiffs are seeking to hold MVI liable for the actions of its agents, then the agents should also be able to invoke the benefits of the principal's arbitration clause. *Roby*, 996 F.2d at 1360; *Arnold*, 920 F.2d at 1281–82 (finding non-signatory defendants entitled to arbitration as agents of the signatory defendant and following "the well-settled principle affording agents the benefits of arbitration agreements made by their principal"); *CD Partners*, 424 F.3d at 800 (finding that non-signatory employees could enforce arbitration agreement against signatory); *Letizia*, 802 F.2d at 1188 (finding arbitration agreement applied to non-signatory employees of principal). Where there exists a sufficiently close relationship between the signatory and non-signatory defendants, there is a strong policy of settling disputes through arbitration. *Dobbins v. Hawk's Enters.*, 198 F.3d 715, 717 (8th Cir. 1999). Finally, any doubts with regard to the arbitrability of a claim should be decided in favor of arbitration, *Telectronics Pacing Sys., Inc. v. Guidant Corp.*, 143 F.3d 428, 430 (8th Cir. 1998), and Plaintiffs have not overcome their heavy burden with respect to Masterman and Clodfelter.

> 7.   *Count 25: Racketeering in Violation of 18 U.S.C. §§ 1951, 1961, 1964, and others*

Count 25 alleges racketeering in violation of 18 U.S.C. §§ 1951, 1961, 1964, and others with all Plaintiffs (HDR, DMC, Rockscapes, Hernandez, and Schmidt) bringing this claim against all Defendants (MVI, Vigil, Masterman, Clodfelter, John Does I–X, and Roe Companies I–X). In addition to the preceding factual allegations, Plaintiffs further allege that Defendants engaged in activities or enterprises with several John Doe Individuals and Roe Companies presently unknown to plaintiffs that affected interstate and foreign commerce through a pattern of racketeering activity. Plaintiffs claim that "[t]he enterprise has been and continues to be a

contractor who secures public works contracts which systematically and continuously controlled, exploited and dominated subcontractors, such as plaintiffs, through their enterprise and activities." (Pls.' Compl. ¶ 516.)  However, Plaintiffs offer no additional proof of this alleged criminal enterprise.

If Plaintiffs cannot identify with some particularity who the John Does and Roe Companies are and what role they played in the alleged criminal enterprise, then this Court cannot preclude arbitration based on unknown persons or entities.  If it would be unjust to allow Plaintiffs to avoid arbitration by merely naming Defendant's employee as a party, the inequity that would result in permitting a party to avoid arbitration by merely naming an unidentified John Doe as a defendant would be even greater. *See Gibson*, 181 F.3d at 1170, n. 3.  Plaintiffs likely hope to identify the alleged "co-conspirators" during discovery; however, in their pleadings they have not alleged any facts showing their existence or the specific role they played in the alleged criminal enterprise. (Pls.' Compl. ¶ 518.)  The Court cannot preclude arbitration based on so little, especially in light of the strong federal policy favoring arbitration. *Moses H. Cone Memorial Hosp.*, 460 U.S. at 24 ("questions of arbitrability must be addressed with a health regard for the federal policy favoring arbitration").  In the end, it is Plaintiffs, who oppose arbitration, that have the burden of overcoming the presumption of arbitrability. *See Mitsubishi Motors*, 473 U.S. at 626.

### 8.    Count 26 & 27: Hobbs Act Violations

In Counts 26 & 27, all Plaintiffs again bring claims against all Defendants.  In Count 26, in addition to the preceding allegations, Plaintiffs allege the following:

> From at least 2008, defendants MVI, Vigil, Clodfelter, Masterman, John Does I–X, and Roe Companies I–X as co-conspirators, did wrongfully obstruct, delay, and affect commerce, as that term is defined in Title 18, United States Code,

36

Section 1951(b)(3) and the movement of articles and commodities in commerce by extortions, as the term is defined in Title 18, United States Code, Section 1951(b)(2) and did attempt and conspire to do so, in that the defendants and co-conspirators did obtain, attempt and conspire to obtain the property of plaintiffs with their consent or against their consent through inducement by the wrongful use of actual and threatened force, violence and fear, including the fear of physical and economic harm, all in violation of Title 18, United States Code, Sections 1951 and 1952.

In Count 27, in addition to the preceding allegations, Plaintiffs allege the following:

From at least 2008, defendants MVI, Vigil, Clodfelter, Masterman, John Does I–X, and Roe Companies I–X as co-conspirators, did unlawfully and willfully extort, request, demand, receive, accept and agree to receive and accept the payment of money from plaintiffs, all in violation of Title 29, United States Code, Section 186.

For the reasons discussed above in *Subsections 6 & 7 (Counts 24 & 25)*, Defendants' motion to compel arbitration should be granted as to Counts 26 and 27.

### 9.    *All Other Counts & Counterclaims*

With respect to all other Counts not specifically addressed in this section, the Court finds that the parties are contractually bound to arbitrate these disputes as required by the arbitration agreements which form part of the USDA and Atomic Museum contracts.  This includes Defendants' four counterclaims raised in their Answer. (Doc. 17.)  The Court finds that these remaining claims all have "a reasonable factual connection to the contract[s]," and are therefore arbitrable. *Coors Brewing Co.*, 51 F.3d at 1516.

While the arbitration of certain of Plaintiffs' claims and not others will inevitably lead to bifurcated proceedings, the Supreme Court has found that district courts may not supplant Congress's views on judicial efficiency with their own. *Dean Witter*, 470 U.S. at 217–19. "[A]greements to arbitrate must be enforced," even if the "goal of speedy and efficient decisionmaking is thwarted . . . ." *Id.* at 219; *see also Moses H. Cone Memorial Hosp.*, 460 U.S.

at 20 ("federal law *requires* piecemeal resolution when necessary to give effect to an arbitration agreement"); *Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 785 (10th Cir. 1998). "Under the [FAA], an arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement." *Moses H. Cone Memorial Hosp.*, 460 U.S. at 20.

## G.    Stay of Proceedings

Federal law's strong policy in favor of enforcing arbitration agreements requires the Court to grant Defendants' Motion to Compel Arbitration as to the majority of Plaintiffs' claims. However, not all of the claims are arbitrable, and this leaves the Court in a dilemma relating to those persons or entities that are parties to the litigation, but not contractually bound to the arbitration agreement.

In their Motion to Compel Arbitration, Defendants also requested that the Court stay all proceedings in this matter pending arbitration. (Doc. 22, ¶¶ 12, 14.)  Section 3 of the FAA, clearly requires a trial court to stay proceedings on an issue if it is referable to arbitration. 9 U.S.C. § 3; *Midwest Mech. Contractors, Inc. v. Commonwealth Constr. Co.*, 801 F.2d 748, 751 (5th Cir. 1986) ("If the issues in a case are within the reach of the agreement, the district court has no discretion under section 3 to deny the stay."); *Lloyd v. Hovensa, LLC.*, 369 F.3d 263, 269 (3d Cir. 2004) (holding that "the plain language of [9 U.S.C.] § 3 affords a district court no discretion to dismiss a case where one of the parties applies for a stay pending arbitration"); *Droll v. Doctor's Associates, Inc.*, 3 F.3d 1167, 1172 (7th Cir. 1993) (holding that courts have no power to dismiss actions where parties are compelled to arbitrate, but rather they should stay the cases until arbitration is complete).  The FAA does not, however, require that the trial court stay proceedings for all claims, only those subject to arbitration.  Thus, it is up to the trial court to

decide whether it "should stay the entirety of the proceedings pending arbitration or stay only that portion of the proceedings that is arbitrable." *Chelsea Family Pharmacy*, 567 F.3d at 1200.

"In some cases . . . it may be advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration. That decision is one left to the district court . . . as a matter of its discretion to control its docket." *Moses H. Cone Memorial Hosp.*, 460 U.S. 1, 20 n. 23  In particular, a stay is appropriate when resolution of the arbitrable claims might have a preclusive effect on the non-arbitrable claims, when the arbitrable claims predominate over the non-arbitrable claims, or where the non-arbitrable claims are of questionable merit. *Chelsea Family Pharmacy*, 567 F.3d at 1200; *Riley Mfg.*, 157 F.3d at 785; *Genesco*, 815 F.2d at 856. The Court finds that a stay of the entire proceedings pending the outcome of arbitration is appropriate in this case.

## IV.    CONCLUSION

Defendants' Motion to Compel Arbitration is GRANTED for Counts 1, 2, 3, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 22, 23, 24, 25, 26, and 27.  Defendants' Motion to Compel Arbitration is DENIED for Counts 4, 19, 20, and 21.  All proceedings in this matter are STAYED pending arbitration.

## ORDER

**WHEREFORE,**

A Memorandum Opinion having been entered this date, **IT IS HEREBY ORDERED** that Defendants' Motion to Compel Arbitration (Doc. 22) is **GRANTED IN PART and DENIED IN PART** and that all proceedings in this matter are **STAYED** pending arbitration.


**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**